**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Amy E. Evers, | ) | No. CV-12-01412-PHX-ROS |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action for judicial review of a denial of disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g).  For the reasons that follow, the decision of the Commissioner denying Plaintiff's claim for benefits will be affirmed.

## I. BACKGROUND

**A.     Procedural History**

In December 2009, Plaintiff filed an application for benefits alleging disability since December 2008 based on depression, anxiety, chronic myeloid leukemia, post traumatic stress disorder ("PTSD"), anemia, panic attacks, obsessive-compulsive disorder ("OCD"), attention deficit disorder ("ADD") and a mood disorder.  (Doc. 11,  Administrative Record [Tr.] 81).

On July 8, 2011, the Administrative Law Judge ("ALJ") found Plaintiff was not under disability and had not engaged in substantial gainful activity from December 1, 2008 through the date of the decision.  (Tr. 15-25).  The ALJ found Plaintiff had the severe impairments

of mood disorder NOS (not otherwise specified), generalized anxiety disorder, and alcohol abuse in reported remission, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (Tr. 18).  The ALJ found Plaintiff's claims were not wholly credible based on the record evidence and that she had the residual functional capacity ("RFC") to perform simple, unskilled work.  (Tr. 20-22).

The Appeals Council denied Plaintiff's request for review (Tr. 1-6), which was a final decision.  On June 29, 2012, Plaintiff filed her complaint seeking to reverse the decision to deny benefits.  (Doc. 1).

**B.    Factual Background**

Plaintiff has a history of anxiety, depression, and other mental conditions.  She was 24 years old on her alleged onset date and worked in the past full-time and part-time as a service clerk at Walgreens for three years and part-time as a home care provider.  Plaintiff had been fired from both of those jobs.  (Tr. 35, 40-45, 207, 215).  Plaintiff has a high school degree and completed a one-year vocational rehabilitation course on computer skills.  At the time of the hearing, Plaintiff worked eight hours a week as a caregiver.  (Tr. 36-37).

In high school, Plaintiff took special education classes and had a low-average IQ, with a full scale IQ of 81, a performance IQ of 87, and a verbal IQ of 79.  (Tr. 561).[1] Upon graduation, educators viewed Plaintiff's attendance problems and inability to relate to peers as barriers to employment and recommended a school-to-work program.  (Tr. 559).

**1.    Treating physician records**

In February 2003, Balbir Sharma, M.D., diagnosed Plaintiff with a personality

---

[1] In December 2011, five months after the ALJ's decision, Plaintiff submitted additional records to the Appeals Council, including mental health records from February 2003 (Tr. 569-81, 585-86), and a two-page December 2011 "Mental Capacities Evaluation" by W.S. Alanian, M.D.

disorder NOS,[2] a history of ADHD, and ruled out bipolar Type II disorder.  (Tr. 577).

In December 2005, psychiatrist John Garofalo, M.D., reviewed Plaintiff's medical records prior to an examination.  Dr. Garofalo noted Plaintiff presented in an extremely exaggerated melodramatic manner and "complain[ed] ceaselessly and without apparent end through our visit . . . [which] reflect[ed] the patient's behaviors in the past as well as drawing attention to her Personality disorder."  (Tr. 580-81).  Dr. Garofalo diagnosed depressive disorder NOS and "personality disorder: borderline/passive/aggressive/ histeraform/somatoform."  (Tr. 581).

Plaintiff has submitted no mental health records corresponding to her December 2008 alleged onset date.  Haider Zafar, M.D., however, diagnosed Plaintiff with chronic myelocytic leukemia in remission since April 2009.  (Tr. 344-45, 337-40).  Plaintiff's physical health is not at issue in this case.

In April 2009, Plaintiff began mental health treatment at Terros Behavioral Health Services.  Therapists noted her diagnoses of episodic mood disorder and anxiety.  She had a lack of emotion and spoke very little.  (Tr. 305-36).  In the next year, she attended approximately six psychiatric sessions and only one individual counseling session.  (Tr. 308-36, 432-63).  During this time Tracie Serrrato, P.A., opined Plaintiff had Axis II characteristics.[3]  (Tr. 443).

In September 2009, Plaintiff presented to Ms. Serrato, who opined Plaintiff was depressed and anxious, took Paxil and Seroquel, but had good concentration, intelligence

---

[2] Personality Disorder NOS is the appropriate diagnosis for a "mixed" presentation in which criteria are not met for any single personality disorder, but features of several personality disorders are present and involve clinically significant impairment.  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 630-31 (4th ed.1994).

[3] The DSM–IV multiaxial scale assesses an individual's mental and physical condition on five axes, each of which refers to a different class of information.  Axis II refers to personality disorders. *DSM-IV*, at 27.

1    and judgment, and no apparent psychosis.  (Tr. 334-35).

2         Plaintiff's May 2010 "Disenrollment Form" indicated medications improved her

3    functioning, but she did not wish to continue treatment.  Plaintiff was diagnosed with

4    unspecified episodic mood disorder and anxiety NOS.  (Tr. 432).

5         In June 2010, Plaintiff started mental health treatment at Valle Del Sol with

6    Meggan Sullivan, B.H.P.  Ms. Sullivan noted Plaintiff seemed to be seeking treatment for

7    "secondary gain"[4] and did not appear to be motivated for treatment.  (Tr. 550).  Between

8    June 2010 and February 2011, Plaintiff attended three individual and group therapy

9    sessions and frequently canceled or did not show up for her scheduled sessions.  (Tr. 483-

10   555).  Therapists diagnosed her with generalized anxiety disorder.  (Tr. 531).

11        In June 2010, a therapist noted Plaintiff reported a lot of symptomology and past

12   trauma but opined Plaintiff was exaggerating and/or was somewhat delusional based on

13   her incongruent statements.  (Tr. 543).

14        In July 2010, psychiatrist Gorky Herrera, M.D., noted Plaintiff was disheveled and

15   very dramatic throughout the interview and had loose and paranoid thoughts.  Dr. Herrera

16   diagnosed a generalized anxiety disorder.  (Tr. 529, 531).  Dr. Herrera commented

17   Plaintiff had a mood disorder and borderline personality disorder.  (Tr. 536).  In

18   September 2010, Dr. Herrera noted Plaintiff seemed "brighter," her status was improved,

19   but she still had generalized anxiety disorder.  (Tr. 519).

20        Also in September 2010, a therapist noted that Plaintiff smiled when thinking about

21   mean things she had done to people, her mood shifted from serious to silly to depressed,

22   and she spoke as if she were a "pre-pubescent" girl.  Plaintiff displayed psychotic features

23   as she made one statement and then, a few minutes later, would state the opposite of what

24   she had just said.  She asked about group therapy but then refused to go because her

25

26        [4] Secondary gain is "interpersonal or social advantages (e.g., assistance, attention, sympathy) gained indirectly from organic illness."  *Stedman's Medical Dictionary*, at 722

27   (27th ed. 2000).

28                                              - 4 -

mother could not accompany her.  Plaintiff reported she was working part-time for an elderly lady.  (Tr. 504, 509).

In February 2011, Plaintiff attended an individual counseling session but did not want to schedule another because she was "good with her meds."  (Tr. 493).  A March 2011 note indicates she had not followed through with the majority of her appointments and was non-compliant with her treatment plan.  As Plaintiff had attended only three appointments, the therapist opined she was not in the correct place for therapy.  (Tr. 489-90).  After an intervention, Plaintiff attended two group therapy sessions.  (Tr. 484, 486).

In December 2011, in a two-page checklist form statement, Dr. Alanian opined Plaintiff had schizoaffective disorder, PTSD, and "possible" mild mental retardation with symptoms of mood swings, paranoia, dysphoria, irritability, decreased attention, poor immediate recall, withdrawal, and frequent thoughts of harming herself or others.  Dr. Alanian opined Plaintiff had no limitations in her ability to understand, carry out and remember instructions and perform simple tasks; moderate limitations in her ability to respond appropriately to co-workers and supervisors and to perform repetitive tasks; and moderately severe limitations in her ability to respond to customary work pressures, perform complex tasks, maintain attention and concentration, demonstrate reliability and emotional stability.  (Tr. 588-89).

**2.    Consultative State Agency Psychological Evaluations**

**a.    February 2010 examination by Dr. Peetoom**

In February 2010, psychologist Greg Peetoom, Ph.D., examined Plaintiff.  (Tr. 376-80).  She presented as depressed, guarded, anxious and fearful and took the medications Paxil and Seroquel.  Dr. Peetoom opined Plaintiff was dependent on her mother, whom she interacted with in a childlike manner.  Dr. Peetoom diagnosed mood disorder NOS, generalized anxiety disorder, and alcohol abuse in remission.  Plaintiff's intellectual ability was below average, her understanding and memory were limited, and she was probably capable of remembering simple work-related instructions.  Dr. Peetoom opined

Plaintiff could complete simple tasks, but may have difficulty completing them consistently in a timely manner. (Tr. 380). She could function in settings where social interactions were very limited, but not where they were a major component of her job. Plaintiff could adapt to simple changes in routine, but it would take her longer than average to make such adjustments. (Tr. 376-80).

### b.   March 2010 evaluation by Dr. Rabara

In March 2010, psychologist Michael Rabara, Psy.D., examined Plaintiff. (Tr. 381-86). Dr. Rabara noted Plaintiff put forth fair-to-poor effort and was childlike in her demeanor which did not seem credible. Plaintiff made an effort to disclose various past traumas, such as sexual abuse as a child and being raped, which Dr. Rabara questioned because people typically avoid such difficult memories. Plaintiff made several dramatic, self-deprecating comments throughout the evaluation and her memory test results fell far below the recommended cutoff, suggesting her effort was "intentionally poor and likely exaggerated." (Tr. 384). Dr. Rabara reported but refused to interpret the memory test results because he thought they were not valid. Regarding Plaintiff's IQ result of 51, Dr. Rabara noted it was highly unlikely that such a person would have been able to have Plaintiff's work history. Dr. Rabara concluded, "[H]er emotional distress is considered genuine, but her reported symptom severity and limitations are likely being exaggerated for the secondary gain of financial assistance." (Tr. 385).

Dr. Rabara diagnosed severe major depressive disorder, recurrent, moderate; anxiety disorder NOS, alcohol and cannabis abuse, and a personality disorder NOS with cluster B traits.[5] Dr. Rabara opined Plaintiff could remember and carry out simple instructions but may have mild difficulty remembering detailed instructions and work-like

---

[5] Cluster B personality disorders consist of antisocial personality disorder, borderline personality disorder, histrionic personality disorder, and narcissistic personality disorder. *DSM-IV*, at 701–17.

procedures.  She may have moderate difficulty carrying out detailed instructions, sustaining concentration, working in coordination with others, getting along with coworkers, responding appropriately to supervisory criticism, and completing a normal workday at a consistent pace.  She may have mild difficulty sustaining ordinary routine and performing activities within a schedule.  Finally, Plaintiff may have mild to moderate difficulty interacting appropriately with the general public and responding appropriately to work setting changes. (Tr. 381-86).

### c.    July 2010 evaluation by Dr. Van Eerd

In July 2010, psychologist Marcel Van Eerd, Psy.D., examined Plaintiff and reviewed her medical records.  Dr. Van Eerd noted Plaintiff was very evasive and avoidant in her responses to basic questions.  (Tr. 414).  Plaintiff was anxious, presented with poor effort and very poor motivation, had below average intellectual functioning, and very limited general and working memory.  Her credibility was "very poor."  Dr. Van Eerd diagnosed depression NOS, anxiety disorder NOS, ruled out PTSD, a learning disability NOS, a personality disorder NOS, and a history of reported ADD.  (Tr. 416). Dr. Van Eerd opined Plaintiff had very limited ability to follow basic, simple work instructions, although she had suggested ability to manage basic instructions in her current work setting, with mild limitations in following simple work instructions and severe limitations for more complex instructions.  Plaintiff had mild limitations in carrying out short, simple instructions, with moderate limitations for new information. She had moderate limitations in interacting with co-workers, the public, and supervisors with poor one-to-one behavior, limited hygiene, poor ability to manage critique and follow work rules, and very limited motivation with moderate limitations in responding to information and change.  (Tr. 412-17).  Dr. Van Eerd recommended therapy, medication compliance, and abstinence from substances.

1
    **d.     March 2010 review by Dr. Zeuss**

2
    In March 2010, state agency psychologist Jonathan Zeuss, Ph.D., reviewed

3
Plaintiff's medical records and completed a mental RFC assessment.  (Tr. 388-405).  Dr.

4
Zeuss opined Plaintiff was not significantly limited in nine areas of functioning,

5
moderately limited in eleven areas of functioning, with no marked limitations.  Dr. Zeuss

6
opined Plaintiff had a good ability to remember and understand simple instructions and

7
procedures and a mildly impaired ability to remember more detailed instructions.  She

8
was able to carry out simple instructions, follow simple work-like procedures, and make

9
simple work-related decisions, but was moderately impaired in her ability to perform

10
detailed tasks, sustain attention for extended periods of time, and perform at a consistent

11
pace and maintain a regular 40 hour work schedule without interference from cognitively

12
based symptoms.  Plaintiff had a fair ability to interact with the general public, co-

13
workers, and supervisors and to respond to work changes.  As such, Dr. Zeuss opined

14
Plaintiff had the basic mental functional capacities to perform simple unskilled work on a

15
sustained basis. (Tr. 388-90).  In July 2010, Nicole Lazorwitz, Psy.D., reviewed

16
Plaintiff's medical records and concurred with Dr. Zeuss's opinion.  (Tr. 81-92).

17
    **3.     Other records**

18
    Plaintiff and her mother submitted statements with Plaintiff's initial disability

19
application.  (Tr. 224-39).

20
    **II. THE ADMINISTRATIVE HEARING**

21
    At the administrative hearing, Plaintiff testified she had depression, anxiety, mood

22
swings, and sometimes flashbacks relating to childhood trauma.  (Tr. 47-48).  On a

23
typical day, Plaintiff woke up at 7:00 p.m. or 8:00 p.m., stayed up all night watching

24
television, and slept during the daytime.  (Tr. 49-50).  Plaintiff worked for four hours on

25
Mondays and Fridays, had no hobbies, drove "very rarely" because it gave her anxiety,

26
and did not go shopping because there were too many people.  (Tr. 44-45, 52, 62).  A

27
vocational expert ("VE") testified that a hypothetical individual of Plaintiff's age,

28

education, and vocational history could perform simple, unskilled work with minimal interaction with co-workers, supervisors, and the general public.  The hypothetical individual could perform the medium work of a floor waxer, paper sorter, and garment sorter.  (Tr. 64-65).  If the individual were limited to sedentary work, she could be a toy stuffer.  (Tr. 63).

### III. ANALYSIS

### A.    Standard of Review

A person is considered "disabled" for the purposes of receiving social security benefits if he or she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).  Social Security disability cases are evaluated using a five-step sequential evaluation process to determine whether the claimant is disabled.  The claimant has the burden of demonstrating the first four steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

In the first step, the ALJ must determine whether the claimant currently is engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. The second step requires the ALJ to determine whether the claimant has a "severe" impairment or combination of impairments which significantly limits the claimant's ability to do basic work activities; if not, a finding of "not disabled" is made and the claim is denied.  At the third step, the ALJ determines whether the impairment or combination of impairments meets or equals an impairment listed in the regulations; if so, disability is conclusively presumed and benefits are awarded.  If the impairment or impairments do not meet or equal a listed impairment, the ALJ will make a finding regarding the claimant's RFC based on all the relevant medical and other evidence in the record.  A claimant's RFC is what he or she can still do despite existing physical, mental, nonexertional, and other limitations.  *Cooper v. Sullivan*, 880 F.2d 1152, 1155 n.5 (9th

1   Cir. 1989).  At step four, the ALJ determines whether, despite the impairments, the
2   claimant can still perform "past relevant work"; if so, the claimant is not disabled and the
3   claim is denied.  The Commissioner bears the burden as to the fifth and final step of
4   establishing that the claimant can perform other substantial gainful work.  *Tackett*, 180
5   F.3d at 1099.

6       The Court has the "power to enter, upon the pleadings and transcript of record, a
7   judgment affirming, modifying, or reversing the decision of the Commissioner of Social
8   Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g).  The
9   decision to deny benefits should be upheld unless it is based on legal error or is not
10  supported by substantial evidence.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198
11  (9th Cir. 2008).  Substantial evidence means "such relevant evidence as a reasonable
12  mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.
13  389, 401 (1971).  "Substantial evidence is more than a mere scintilla but less than a
14  preponderance."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (internal
15  quotation marks and citation omitted).  The Court must consider the record in its entirety
16  and weigh both the evidence that supports and the evidence that detracts from the
17  Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir.1985).

18  **B.    Discussion**

19      **1.    Opinion evidence and the ALJ's RFC Assessment**

20      Generally, a treating physician's opinion is afforded more weight than the opinion
21  of an examining physician, and an examining physician's opinion is afforded more weight
22  than a non-examining reviewing or consulting physician's opinion.  *Holohan v.*
23  *Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).  Where a treating doctor's opinion is
24  uncontradicted, an ALJ may reject it only for "clear and convincing" reasons; however, a
25  contradicted opinion of a treating or examining physician may be rejected for "specific
26  and legitimate" reasons.  *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).
27  When there is conflicting medical testimony, the ALJ must provide specific and

28                                          - 10 -

1    legitimate reasons, supported by substantial evidence, for rejecting the opinion of medical

2    experts. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.2002).  "The ALJ can meet this

3    burden by setting out a detailed and thorough summary of the facts and conflicting

4    clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes v.*

5    *Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (internal quotation marks omitted).

6        In this case, in making her RFC assessment, the ALJ gave fair weight to the

7    opinions of State agency examining physicians Drs. Peetoom, Rabara, and Van Eerd,

8    whose RFC assessments conflicted in a few areas regarding Plaintiff's limitations.  The

9    ALJ was concerned mainly with Plaintiff's credibility in reporting her subjective

10    complaints.  Plaintiff argues the ALJ erred by failing to provide specific and legitimate

11    reasons in considering the opinions of Drs. Peetoom, Rabara, and Van Eerd.  (Doc. 12 at

12    2).  Defendant argues the ALJ's opinion is supported by substantial evidence and any

13    alleged error was harmless.  (Doc. 14 at 9).

14        The ALJ provided specific and legitimate reasons for assigning weight to the

15    opinions of Drs. Peetoom, Rabara, and Van Eerd.  As to Dr. Van Eerd, the ALJ explained

16    he could not afford more than fair weight to his opinion due to Plaintiff's obvious lack of

17    effort or motivation to participate in the evaluation.  (Tr. 22, 414).  Dr. Van Eerd noted

18    Plaintiff was "very evasive" and avoidant in response to basic questions and her

19    credibility was "very poor."  (Tr. 414, 416).  The ALJ explained Dr. Van Eerd's

20    assessment appeared to be overly restrictive given Plaintiff's credibility as it appeared to

21    incorporate Plaintiff's subjective complaints.  (Tr. 22).

22        In assessing Dr. Rabara's opinion, the ALJ raised similar credibility concerns.  (Tr.

23    23).  The ALJ explained that Dr. Rabara opined Plaintiff put forth fair-to-poor effort, her

24    child-like demeanor did not seem credible, and she appeared to intentionally exaggerate

25    her symptoms.  (Tr. 23, 384-85).  The ALJ observed Dr. Rabara's opinion that a person

26    with Plaintiff's purported IQ score of 51 could not have possibly worked at Walgreens for

27    three years and that Plaintiff showed an abnormal motivation to share traumatic past

28

1    events.  Plaintiff appeared to be motivated by secondary financial gain from disability

2    benefits.  (Tr. 23, 385).  Dr. Rabara reported, but refused to interpret, the memory test

3    results because he thought they were not valid.  The ALJ discussed these concerns and

4    found Dr. Rabara's "ultimate opinion" was a more realistic assessment of Plaintiff's

5    functional abilities and incorporated them into his RFC assessment.  (Tr. 23, 386).

6        Plaintiff's argument that the ALJ erred by not incorporating Dr. Rabara's findings

7    of mild limitations in sustaining an ordinary routine and moderate limitations sustaining

8    concentration and completing a normal workday is without merit.  (Doc. 12 at 17-18).  At

9    the hearing, the VE testified that a hypothetical individual with approximately eleven

10   moderate limitations, including sustaining concentration, most likely could not work.

11   However "if a few of [the limitations] were mild, then I would say that there would be no

12   problem at all . . . ."  (Tr. 68-69).  Dr. Zeuss opined, however, even with Plaintiff's

13   moderate limitation for sustaining concentration, Plaintiff had the basic mental functional

14   capacities to perform simple, unskilled work on a sustained basis.  (Tr. 388-90).  The ALJ

15   gave each of the consultative doctors fair weight in making her own conclusion.

16       The ALJ noted Dr. Peetoom's opinion yielded similar findings to those of Dr.

17   Rabara and Dr. Van Eerd.  Notably, Dr. Peetoom opined Plaintiff was capable of simple

18   work with minimal social interaction with coworkers.  (Tr. 23).  The ALJ observed that

19   Dr. Peetoom's opinion was corroborated by Dr. Lazorwitz's opinion (Tr. 90-91), and thus

20   afforded them each fair weight in making her determination.  (Tr. 23).

21       In this case, the ALJ extensively discussed Plaintiff's reported symptoms,

22   impairments and limitations, and considered the physician's opinion evidence to reach her

23   conclusions regarding Plaintiff's RFC.  The ALJ did not determine Plaintiff's ability to

24   perform work on the sole basis of any single RFC assessment.  Instead, the ALJ offered

25   specific and legitimate reasons to support the conclusion that Plaintiff has the RFC to

26   perform light work with some restrictions which is also supported by substantial evidence

27   in the record.  Significantly, none of the consultative physicians, whom Plaintiff relies on,

28                                           - 12 -

1    opined Plaintiff had limitations that would preclude all employment.

2         Defendant argues the ALJ adequately assessed Plaintiff's credibility, while Plaintiff

3    contends her personality disorder accounts for her credibility issues.  "The ALJ is

4    responsible for determining credibility, resolving conflicts in medical testimony, and for

5    resolving ambiguities."  *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).  "If the

6    evidence can support either affirming or reversing the ALJ's conclusion, [the court] may

7    not substitute [its] judgment for that of the ALJ."  *Robbins v. Soc. Sec. Admin.,* 466 F.3d

8    880, 882 (9th Cir. 2006).

9         The ALJ did not err in determining Plaintiff's credibility.  As discussed above, the

10   ALJ noted several physicians, including Drs. Eerd and Rabara, who raised serious

11   concerns regarding Plaintiff's credibility.  (Tr. 20-23, 384-85, 414-16).  Ms. Sullivan also

12   opined Plaintiff seemed to be seeking treatment for secondary gain.  (Tr. 550).

13   Additionally, the ALJ discussed how Plaintiff's hearing testimony was contradicted by

14   both her own and her mother's submitted statements.  (Tr. 21).  For example, Plaintiff

15   specifically denied using a computer at the hearing but reported she used it daily in her

16   statement.  (Tr. 21, 50, 224).  Plaintiff's mother reported Plaintiff could fix simple meals,

17   assist with laundry and cleaning an hour each day, go outside 2-3 times per week, and

18   shop for food once a week (Tr. 232-36), activities Plaintiff testified she could not do.

19   Instead, she stayed at home day and night for fear someone would hurt her.  (Tr. 21, 49-

20   50).  *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not

21   required to believe every allegation of disabling pain, or else disability benefits would be

22   available for the asking . . . .") (citation omitted).  Further, Plaintiff worked for three years

23   as a service clerk at Walgreens and as a home care provider after she was diagnosed with

24   a personality disorder in February 2003.  *See also Cameron v. Astrue*, No. 07-CV-8167,

25   2008 WL 4850023, at *9 (D.Ariz. Nov. 7, 2008) (holding substantial evidence supported

26   ALJ's finding of lack of credibility when Plaintiff worked for a number of years despite

27   her personality disorder).

28
                                          - 13 -

1

    **2.**    **Personality disorder**

2        Plaintiff argues the ALJ erred by failing to acknowledge her personality disorder as

3  a severe impairment.  (Doc. 12 at 2).  But the ALJ discussed at length symptoms of

4  Plaintiff's personality disorder when addressing Plaintiff's mental impairments and

5  credibility.  (Tr. 20-23).  The ALJ adequately considered all symptoms arising from

6  Plaintiff's alleged impairments even though the ALJ did not mention Plaintiff's

7  personality disorder by name.  *See Frampton v. Astrue*, No. 10-35194, 2010 WL 4813710

8  at *1 (9th Cir. Nov. 24, 2010) (holding an ALJ may adequately consider all symptoms

9  without referring to every impairment by name).  And even if the ALJ did err by not

10  finding the personality disorder a severe condition, any error would be harmless as the

11  ALJ addressed the impairment at later steps in her decision.  (Tr. 20-23).  *See Lewis v.*

12  *Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (finding harmless error where an ALJ failed to

13  discuss an impairment at Step Two but discussed it in later steps).

14        Accordingly,

15        **IT IS ORDERED** that the decision of the Commissioner denying Plaintiff's claim

16  for benefits is affirmed.

17        **IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment

18  accordingly.

19        DATED this 8th day of May, 2013.

20

21

22                                  Roslyn O. Silver

23                    Chief United States District Judge

24

25

26

27

28